# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GEORGE CANNING, *et al.*,

        *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
STATE,

        *Defendant.*

Civil Action No. 13-831 (RDM)

SAE PRODUCTIONS, INC.,

        *Plaintiff*,

    v.

UNITED STATES DEPARTMENT OF
STATE,

        *Defendant.*

Civil Action No. 15-1245 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

This action involves two overlapping Freedom of Information Act ("FOIA"), 5 U.S.C.

§ 552, requests for State Department records, and two lawsuits seeking to compel the

Department to release those records. The first request, submitted by Plaintiffs George Canning

and Jeffrey Steinberg ("the *Canning* Plaintiffs"), sought (1) a 2010 memorandum from the

President to his foreign policy advisors, entitled "Presidential Study Directive 11" ("PSD-11"),

and related records, and (2) records concerning the Muslim Brotherhood. Dkt. 72-4 at 2. That

request is the subject of the litigation in *Canning v. Department of State*, No. 13-cv-831 ("the

*Canning* case"). The parties to the *Canning* case, with leave of the Court, previously filed cross-

motions for summary judgment with respect to the first category of records—records relating to

PSD-11—and the Court issued an opinion resolving those motions. *Canning v. Dep't of State*,

134 F. Supp. 3d 490 (D.D.C. 2015) ("*Canning I*"). The second request, submitted by SAE

Productions, Inc. ("SAE"), piggybacked on the first. It referred to a news report about the

*Canning* case and requested copies of three documents quoted in the article and all other

"records that are being processed pursuant to" the *Canning* Plaintiffs' FOIA request. Dkt. 72-4

at 24–25. The second request is the subject of the litigation in *SAE Productions, Inc. v.

Department of State*, No. 15-cv-1245 ("the *SAE* case").

Given the overlap between the *Canning* and *SAE* cases, the Court granted the State

Department's motion to consolidate, *see* Minute Order (July 13, 2017), which the Department

filed almost two years after the Court issued the *Canning I* opinion, Dkt. 67. After the cases

were consolidated, the State Department moved for summary judgment with respect to all

remaining claims in the two cases, Dkt. 74; the *Canning* and *SAE* Plaintiffs opposed that motion,

Dkt. 80, Dkt. 77; and the *Canning* Plaintiffs also filed a cross-motion for summary judgment

with respect to one document, Dkt. 79, and contested the adequacy of the State Department's

response to the *Canning I* decision, Dkt. 49. As narrowed by the parties in their respective

briefs, only the following issues remain for decision: SAE (1) contests the adequacy of the State

Department's search for responsive records and (2) challenges the Department's reliance on

FOIA Exemption 5 to withhold certain purportedly deliberative records, and the *Canning*

Plaintiffs (1) challenge the Department's reliance on FOIA Exemption 1 to withhold certain

purportedly classified records that were classified after they submitted their FOIA request and

(2) dispute its invocation of FOIA Exemption 5 to withhold certain purportedly deliberative

records.

For the reasons explained below, the Court concludes that the Department's search was adequate. With respect to those records that were classified in whole or in part after the *Canning* Plaintiffs submitted their FOIA request, the Court concludes that the Department has satisfied the requirements of Executive Order 13562—which governs the processes for post-request classification of responsive records—for all but four of the withheld records. As to those four, however, the Department has not yet shown that it complied with Executive Order 13562, and thus has not shown that it properly invoked FOIA Exemption 1. With respect to the Defendant's reliance on the deliberative process privilege to withhold various records, the Court concludes, first, that the *Canning* Plaintiffs have failed to establish the absence of a dispute of material fact as to the one document at issue in their cross-motion for summary judgment; second, that the Department has failed to carry its similar burden as to three "draft" letters to King Abdullah of Saudi Arabia; and, finally, that the Department has carried its burden as to its remaining assertions of the deliberative process privilege. The Court will, accordingly, grant in part and deny in part the Department's motion for summary judgment and will deny the *Canning* Plaintiffs' cross-motion for summary judgment.

## I. BACKGROUND

### A.     FOIA Requests

 1. Canning *Plaintiffs' Request*

In December 2012, George Canning submitted a FOIA request to the State Department seeking four categories of records:

> (1) A copy of Presidential Study Directive 11 ["PSD-11"], as issued by President Obama.

> (2) Documents and other information created or compiled by the State Department which was utilized internally to the State Department and/or in submission to the President, in the creation of PSD-11.

(3)      Documents and other information created or compiled by the State Department which were generated pursuant to the mandates of PSD-11.

(4)      All reports created or compiled by the State Department from 2005 to [the] present, concerning contacts or interviews with, or otherwise about, individuals identified as leaders of the Muslim Brotherhood, or otherwise analyzing the Muslim Brotherhood's role in Muslim nations.

Dkt. 72-4 at 2.  PSD-11 is a classified document, which Plaintiffs claim was created "for the purpose of ordering an assessment of the Muslim Brotherhood and other 'political Islamist' movements."  Dkt. 1 at 2 (SAE Compl. ¶ 6), *SAE Prods., Inc. v. Dep't of State*, No. 15-cv-1245 (D.D.C.); *see also* Dkt. 1 at 3 (Canning Compl. ¶ 10).  Jeffrey Steinberg was later added as a co-requester, and Canning and Steinberg filed suit together in June 2013 seeking to compel the Department to search for and to produce all responsive records on an expedited basis.  *See* Dkt. 1 (Canning Compl.).

      2.     *SAE Productions Request*

In June 2014, a publication based in Dubai—*Gulf News Report*—published an article entitled "U.S. Document Reveals Cooperation Between Washington and Brotherhood."  Dkt. 72-4 at 26.  According to the article, President Obama issued PSD-11 in 2010 to obtain "an assessment of the Muslim Brotherhood and other 'political Islamist' movements."  *Id.*  Although observing that "PSD-11 remains classified," the article reported that, pursuant to "an ongoing . . . FOIA[] lawsuit, thousands of pages of documentation of the . . . State Department's dealings with the Muslim Brotherhood are in the process of being declassified and released to the public."  *Id.*  The article then quoted from three documents "obtained under . . . FOIA": (1) "A State Department Cable" regarding an April 2012 meeting between "Mission Benghazi" and "a senior member of the Muslim Brotherhood steering committee;" (2) "Another State Department paper

4

. . . contain[ing] talking points for Deputy Secretary of State William Burns' scheduled . . . meeting with [a] Muslim Brotherhood leader" and noting that, until recently, "the Muslim Brotherhood was banned for over three decades;" and, finally, (3) "An undated State Department cable" that referred to "Mohammad Swan, Chairman of [the] Justice and Construction Party." *Id.* at 26–27.

Shortly after the *Gulf New Report* article appeared, SAE submitted a FOIA request to the State Department that requested copies of the documents discussed in the article and "all . . . records that are being processed pursuant to" the FOIA request mentioned in the article. Dkt. 72-4 at 24–25. The State Department has since confirmed that the only FOIA request relating to the Muslim Brotherhood that was pending before it at the relevant time was the *Canning* Plaintiffs' request. Dkt. 72-1 at 5 (First Stein Decl. ¶ 9); Dkt. 74-2 at 2 (Def.'s SUMF ¶ 5). The Department, accordingly, released to SAE all of the records that it had previously released to the *Canning* Plaintiffs. Dkt. 72-1 at 6 (First Stein Decl. ¶ 11).

## B. Procedural History

Prior to consolidation of the *Canning* and *SAE* cases, the parties to the *Canning* case conferred and agreed to prioritize the production of records relating to PSD-11 and, with leave of the Court, filed cross-motions for partial summary judgment regarding the Department's response to that portion of the *Canning* Plaintiffs' request. *Canning I*, 134 F. Supp. 3d at 497–98. While those motions were pending, the State Department continued to process and to produce records responsive to the remaining portion of the *Canning* Plaintiffs' request—that is, their request for records relating to the Muslim Brotherhood. *Id.* at 498. In the *Canning I* decision, the Court granted in part and denied in part the parties' competing cross-motions for partial summary judgment. The Court granted the *Canning* Plaintiffs' motion to the extent it sought disclosure of the portion markings that were redacted from two documents, but otherwise

denied the motion. *Id.* at 518. The Court, moreover, denied the Department's cross-motion with respect to the withholding of records that were classified after the *Canning* Plaintiffs' submitted their FOIA request, but otherwise granted the motion. *Id.* With respect to the post-request classification of responsive documents, the Court directed the Department to supplement the record with additional information regarding the post-request classification process. *Id.* The Department did so, Dkt. 48, and the *Canning* Plaintiffs challenged the adequacy of that further submission, Dkt. 49; *see also* Dkt. 51 (Department's reply).

After the Court issued the *Canning I* decision, the parties agreed to defer entry of a further briefing schedule until the Department had completed its review and processing of potentially responsive records, Dkt. 53, and the parties engaged in extended negotiation regarding the terms and scope of the search, Dkts. 55–65. After agreeing that the Department's search was adequate and narrowing their disagreement regarding the relevant withholdings, the parties jointly proposed a schedule for briefing the remaining issues. Dkt. 66 at 2.

Shortly before the Court issued the *Canning I* decision, SAE brought its own FOIA action. *SAE Prods., Inc. v. Dep't of State*, No. 15-cv-1245 (D.D.C. filed June 4, 2013). That action was assigned to Judge Chutkan and proceeded along a parallel schedule for over two years. Over that time, SAE withdrew its request for PSD-11, Minute Order (Nov. 30, 2015), *SAE Prods.*, No. 15-cv-1245, and the Department made several productions. *See, e.g.*, *id.*, Minute Order (Jan. 5, 2016), *SAE Prods.*, No. 15-cv-1245, Minute Order (April 18, 2016), *SAE Prods.*, No. 15-cv-1245, Minute Order (Aug. 25, 2016), *SAE Prods.*, No. 15-cv-1245. Eventually, SAE and the Department proposed that Judge Chutkan adopt the same briefing schedule set in the *Canning* case, and the State Department indicated that it intended "to move shortly to consolidate [the *SAE*] case with *Canning*." Dkt. 24 at 2, *SAE Prods.*, No. 15-cv-1245.

The Department subsequently moved to consolidate, Dkt. 25, *SAE Prods.*, No. 15-cv-1245, and neither SAE, Dkt. 26, *SAE Prods.*, No. 15-cv-1245, nor the *Canning* Plaintiffs opposed that motion, Dkt 67. The Court, accordingly, consolidated the cases and set a revised briefing schedule. Minute Order (Sept. 27, 2017). The State Department has now moved for summary judgment in both cases, Dkt. 74; the *Canning* Plaintiffs and SAE have opposed that motion, Dkt. 80, Dkt. 77; and the *Canning* Plaintiffs have cross-moved for partial summary judgment with respect to a single document, Dkt. 79.

## II. LEGAL STANDARD

The Freedom of Information Act is premised on the notion that "an informed citizenry [is] vital to the functioning of a democratic society . . . [and] needed to check against corruption and to hold the governors accountable to the governed.'" *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). The Act embodies a "general philosophy of full agency disclosure." *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 494 (1994) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 360 (1976)). It thus mandates that an agency disclose records on request unless they fall within one of nine exemptions. *See* 5 U.S.C. § 552(b). "These exemptions are 'explicitly made exclusive' and must be 'narrowly construed.'" *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (first quoting *EPA v. Mink*, 410 U.S. 73, 79 (1973), then quoting *FBI v. Abramson*, 456 U.S. 615, 630 (1982)).

FOIA cases are typically resolved on motions for summary judgment under Federal Rule of Civil Procedure 56. *See Beltranena v. U.S. Dep't of State*, 821 F. Supp. 2d 167, 175 (D.D.C. 2011). To prevail on a summary judgment motion, the moving party must demonstrate that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). An agency may meet this

burden by submitting "relatively detailed and non-conclusory" affidavits or declarations, *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), and an index of the information withheld, *Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973); *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998). An agency "is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced . . . or is wholly exempt from [FOIA's] inspection requirements.'" *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978)). The Court reviews the agency's decision *de novo*, and the agency bears the burden of sustaining its action. 5 U.S.C. § 552(a)(4)(B).

## III.  ANALYSIS

### A.    Adequacy of the Search

As noted above, the *Canning* Plaintiffs do not contest the adequacy of the Department's search. Dkt. 66 at 1 (Joint Status Report ¶ 3). Although SAE does not challenge the adequacy of the Department's search for the second category of records it seeks—that is, "copies of documents processed pursuant to" the *Canning* Plaintiffs' FOIA request—it does argue that the Department has failed to carry its burden of showing that it conducted a reasonable search for the first category of records—that is, copies of the documents identified in the *Gulf News Report* article. Dkt. 77 at 8. According to SAE, the Department has not indicated which search terms and timeframe it used and has not explained why it searched only a single database, the "FREEDOMS 2" or "F2" database. *Id.* In short, according to SAE, the Department has not offered "even a scintilla of information" regarding the search. *Id.* As explained below, this contention is belied by the record.

An agency fulfills its obligations under FOIA to conduct an adequate search "if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)).  The agency "cannot limit its search to only one record system if there are others that are likely to turn up the information requested," but, at the same time, it need not "search every record system." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).   Similarly, the agency need not deploy every conceivable search term or permit the FOIA requester to dictate the search terms in the course of litigation, but it must use terms reasonably calculated to locate responsive records. *Agility Pub. Warehousing Co. K.S.C. v. NSA*, 113 F. Supp. 3d 313, 339 (D.D.C. 2015).  To prevail on summary judgment, the agency must submit declarations that "'denote which files were searched,' [and] by whom those files were searched, and [that] reflect a 'systematic approach to document location.'" *Liberation Newspaper v. U.S. Dep't of State*, 80 F. Supp. 3d 137, 144 (D.D.C. 2015) (quoting *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 371 (D.C. Cir. 1980)); *see also Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006); *Oglesby*, 920 F.2d at 68.  Those declarations "are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs.*, 926 F.2d at 1200 (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)).  But where "a review of the record raises substantial doubt, particularly in view of 'well defined requests and positive indications of overlooked materials,' summary judgment is inappropriate." *Valencia-Lucena*, 180 F.3d at 326 (citation omitted).

The State Department relies on two declarations from Eric Stein, the Director of the Department's Office of Information Programs and Services ("IPS"), in support of its contention that it conducted an adequate search for the records identified in the *Gulf News Report* article. *See* Dkt. 72-1 (First Stein Decl.); Dkt. 81-1 (Second Stein Decl.). In the first, Stein attests that the IPS Branch Chief for Litigation and Appeals reviewed SAE's FOIA request for "copies of all the State Department documents and records identified in [the] June 18, 2014 Gulf News Report" and "determined that the only FOIA lawsuit against the Department concerning the Muslim Brotherhood was the suit filed by Plaintiffs Canning and Steinberg." Dkt. 72-1 at 5 (First Stein Decl. ¶ 9). Based on this assessment, which SAE does not dispute, the Branch Chief searched the "F2" database "using information quoted in" the "*Gulf News Report* article cited in SAE's request," and she "located the documents described in the article." Dkt. 72-1 at 5 (First Stein Decl. ¶ 9). The second Stein declaration further attests that the IPS Branch Chief used search terms derived from the *Gulf News Report* article's quotations from the documents SAE sought, which included "Mission Benghazi," "banned for over three decades," and "Chairman of Justice and Construction Party." Dkt. 81-1 at 3–4 (Second Stein Decl. ¶ 5). Taken together, the Department maintains, these declarations demonstrate that the search was adequate. Dkt. 81 at 6.

SAE raises a number of questions regarding the adequacy of the searches—but each is readily answered, and none of those answers suggest that the Department's search was inadequate.

*First*, SAE asks: what search terms did the Department use? The answer to that question is straightforward. SAE sought three documents, each of which was quoted in the *Gulf News Report* article. So, the Department took a distinctive phrase from each of the three quoted passages—"Mission Benghazi," "banned for over three decades," and "Chairman of Justice and

Construction Party"—and searched for that phrase. Dkt. 81-1 at 3–4 (Second Stein Decl. ¶ 5). That search process, moreover, proved successful. Each of the phrases "located" a document that contained "the same language quoted in the article," and, as SAE's request posited, each of those documents was among the records "previously produced to [the *Canning* Plaintiffs] in response to" their FOIA request. *Id.* To the extent this process might have left any doubt about whether the Department found the exact documents that SAE sought, Exhibit 2 to the Second Stein declaration puts that doubt to rest. That exhibit compares the language quoted in the *Gulf News Report* article to the language appearing in the documents that the Department released to SAE, and it shows that the same—extended—quotes appear in both. Indeed, the punctuation and capitalization are identical, and, where the *Gulf News Report* article varied slightly from one of the documents, the author used brackets to reflect that minor variance. Dkt. 81-3 at 1–2 (Second Stein Decl.) (Ex. 2).

*Second*, SAE asks: what timeframe did the Department use for purposes of its search? Here, too, the record provides an answer. SAE requested copies of the three documents quoted in the *Gulf News Report* article, all three of which, according to SAE, the Department had previously released to the *Canning* Plaintiffs. According to the Stein declaration, the Department located and produced to SAE "all material that had been previously released in *Canning, et al. v. State*, 13-cv-831." Dkt. 72-1 at 6 (First Stein Decl. ¶ 11). There was no reason for the Department to search for records created after its earlier release of records to the *Canning* Plaintiffs—or after publication of the *Gulf News Report* article—and the record clearly establishes that the Department not only searched for, but located, the records from the relevant timeframe.

*Finally*, SAE asks: why did the Department search only one database, the "FREEDOMS 2" or "F2" database? The Second Stein declaration answers this question as well: "F2 is the database in which the Department maintains documents released in response to FOIA requests." Dkt. 81-1 at 3 (Second Stein Decl. ¶ 4). Because SAE sought records that the Department had released in response to a prior FOIA request, this was the obvious place to search. As explained in the Second Stein declaration, the search was "reasonably calculated to uncover all relevant documents" responsive to SAE's request. *Valencia-Lucena*, 180 F.3d at 325 (quoting *Truitt*, 897 F.2d at 542). FOIA requires nothing more.

The Court thus concludes that the Department's search for records responsive to SAE's FOIA request was adequate and that the Department, accordingly, is entitled to summary judgment on this issue.

**B.      Withholdings**

Both the *Canning* Plaintiffs and SAE contend that the Department has failed to carry its burden with respect to a handful of withholdings. The *Canning* Plaintiffs oppose the Department's motion for summary judgment, arguing that the Department has not shown (1) that certain records withheld under Exemption 1 (including records addressed in *Canning I*) were properly classified under the post-request standard for classification; (2) that a handful of other documents withheld under Exemption 1 that are marked "unclassified" are, in fact, classified; and (3) that three documents withheld under Exemption 5 are, in fact, deliberative. With respect to one of those three documents, moreover, the *Canning* Plaintiffs go a step further and argue that they have carried their burden of showing that the document is *not* deliberative and that it therefore must be released. SAE, for its part, raises only a general challenge to the Department's withholdings. It argues that the Department has failed to provide sufficient detail—either in its *Vaughn* index or elsewhere—to permit the Court to determine whether the thirty-eight

documents withheld as deliberative under Exemption 5 are, in fact, deliberative.  The Court

holds (1) that the Department has not yet justified its use of post-request classification to

withhold four documents; (2) that it has not yet justified its use of the deliberative process

privilege to withhold three additional documents; but (3) that the Department has otherwise

carried its burden.

      1.     *Exemption 1*

FOIA Exemption 1 covers "matters that are . . . specifically authorized under criteria

established by an Executive order to be kept secret in the interest of national defense or foreign

policy and . . . are in fact properly classified pursuant to such Executive order."  5 U.S.C.

§ 552(b)(1).  Executive Order 13526 ("EO 13526"), 75 Fed. Reg. 707 (Dec. 29, 2009), in turn,

establishes procedural and substantive requirements for classification of national security

information.  As relevant here, Executive Order 13526 authorizes the classification of

information pertaining to "foreign relations or foreign activities of the United States, including

confidential sources," when the "unauthorized disclosure" of such information "could reasonably

be expected to cause identifiable or describable damage to the national security."  EO 13526

§ 1.4(d); *see id.* § 1.2.

The *Canning* Plaintiffs challenge the withholding of documents, or portions thereof, that

were classified *after* they submitted their FOIA request.  As the Court explained in *Canning I*, if

documents are "'classified after the relevant FOIA request was submitted,' the Department must

show that 'the agency satisfied the requirements of [Executive Order 13526] § 1.7(d).'"  *Canning*

*I*, 134 F. Supp. 3d at 506 (quoting *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 167

(D.D.C. 2013)).  That section provides in relevant part:

> Information that has not previously been disclosed to the public under proper
> authority may be classified . . . after an agency has received a request for it
> under the Freedom of Information Act . . . *only if* such classification meets the

requirements of this order *and* is accomplished on a document-by-document basis *with the personal participation or under the direction of the agency head, the deputy agency head, or the senior agency official designated under [S]ection 5.4 of this order*.

EO 13526 § 1.7(d) (emphasis added).

The following principles, accordingly, must guide the Court's consideration. *First*, FOIA Exemption 1 applies only to records that have been "properly classified" pursuant to the governing Executive Order. 5 U.S.C. § 552(b)(1). *Second*, with respect to records that are classified *after* the agency receives a FOIA request, Executive Order 13526 permits classification only if three conditions are satisfied: (1) the records must otherwise meet the requirements for classification, (2) the classification must be "accomplished on a document-by-document basis," and (3) that review must occur either (a) "with the personal participation" of "the agency head, the deputy agency head, or the senior agency official designated under" the Executive Order or (b) "under the direction" of one of those three officials. EO 13526 § 1.7(d). *Third*, and inherent in the prior principle and the structure of the Executive Order, an agency may not unreservedly delegate that post-request review responsibility to any other official; rather, for reasons that the Court has previously explained, one of the three officials identified in Executive Order 13526 must either personally participate in the review or the review must take place "under [his or her] direction." *Canning I*, 134 F. Supp. 3d at 507–08.

The description of these principles is straightforward; their application is more challenging. In responding to the *Canning* Plaintiffs' first three FOIA requests, which were also at issue in *Canning I*, the Department classified, upgraded, or clarified the classification of ten documents pursuant to Section 1.7(d). *See* 134 F. Supp. 3d at 506 & n.5. And in responding to their fourth request, which seeks records relating to the Muslim Brotherhood, the Department

classified fifty-four documents, in whole or in part, pursuant to Section 1.7(d).[1]  Dkt. 81-1 at 4

(Second Stein Decl. ¶ 6).  All but four of these documents were reviewed and classified by

Margaret Grafeld, who at the time served as the Deputy Assistant Secretary for Global

Information Services, and the remaining four documents were reviewed and classified by Eric

Stein, who currently serves as the State Department's Director of the Office of Information

Program and Services.  *Id.* at 1, 4–5 (Second Stein Decl. ¶¶ 1, 6, 8).  The uncontroverted

evidence further shows that Grafeld and Stein reviewed and classified the relevant records on a

document-by-document basis, *see* Dkt. 48-1 at 2 (Grafeld Decl. ¶ 3); Dkt. 72-1 at 10–11 (First

Stein Decl. ¶ 30), as required by the Executive Order, *see* EO 13526 § 1.7(d).

Although the *Canning* Plaintiffs acknowledge that this evidence "satisfies the Court's

requirement for a showing [that] the classifier reviewed each document," Dkt. 80 at 15, fulfilling

the requirement that review be conducted on a document-by-document basis, they raise three

challenges to the Department's withholding of the records based on its post-request classification

decisions.  The Court will address each challenge in turn.

a.     Explanation of Reasons for Classifying the Records

The *Canning* Plaintiffs first argue that the Department was required to do more "to

explain the reasons" why it decided to classify "previously-unclassified information."  Dkt. 49 at

4; Dkt. 80 at 11.  In pressing this argument, however, they conflate the well-established

requirement that an agency seeking summary judgment in a FOIA action must proffer

declarations or other evidence "describ[ing] the justifications for nondisclosure with reasonably

specific detail," *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009), and a new

_____

[1]  The *Canning* Plaintiffs do not challenge the Department's decision to withhold four of these
documents: C05619421, C05619422, C05619424, and C05655960.  Dkt. 81-1 at 5 (Second Stein
Decl. ¶ 6 n.4); Dkt. 80 at 11.

requirement, which they would have the Court add, that an agency that classifies records after a FOIA request is submitted must explain "the timing of the decision[], that is, 'what changed' to justify classification of previously unclassified documents."  *Canning I*, 134 F. Supp. 3d at 507; *see also* Dkt. 49 at 4 (reasserting argument "notwithstanding the Court's disagreement").

There can be no dispute that the Department satisfied the first of these requirements.  As to each post-request classification decision, the Department explains with "reasonably specific detail" the basis for decision in its *Vaughn* index.  See Dkt. 81-2 at 5–8, 11, 13–14, 17–24, 29–47, 49, 51.  To take just one example, the Department explains that it "classified portions of [a] document that were originally UNCLASSIFIED as CONFIDENTIAL" because those portions of the document "contain[] sensitive details regarding the security situation in Libya and Egypt," which were "provided by a foreign government in confidence," and because the Department's "[r]elease of the . . . information . . . would cause foreign officials to believe that U.S. officials are not able or willing to observe the confidentiality expected in such interchanges."  *Id*. at 5.  Given the deference that courts must accord to judgments made by the Executive Branch on issues of national security and foreign policy, *see, e.g.*, *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 926–27 (D.C. Cir. 2003), this description, and the other, similar descriptions contained in the *Vaughn* index, are sufficient to show that the withheld information "logically fall[s] within" Exemption 1, *Larson*, 565 F.3d at 401.

There is no support, moreover, for the *Canning* Plaintiffs' contention that FOIA or Executive Order 13526 imposes the further requirement that, if an agency does not classify a record until after it receives a FOIA request, the agency must not only explain the basis for its classification decision but must also explain "what changed."  Dkt. 49 at 4.  Plaintiffs do not cite any relevant authority in support of this contention, and nothing in the text of Section 1.7(d) of

the Executive Order supports their position.  With respect to the substance of the classification

decision, the Executive Order mandates that the record meet "the requirements" for

classification, EO 13526 § 1.7(d), and those requirements include a finding that "disclosure

could reasonably be expected to cause identifiable or describable damage to," *id.* § 1.4, the

"national defense or foreign relations of the United States," *id.* § 6.1 (cc).  Given this mandate, it

is appropriate to put the classifying agency to the test of explaining—in general terms—how

disclosure could harm the national security interests of the United States.  Once the agency does

so, however, it is shown that the record at issue was "properly classified pursuant to [the]

Executive Order," 5 U.S.C. § 552(b)(1), and FOIA requires nothing more.

   b. <u>"Ambiguously Marked" Documents</u>

 The *Canning* Plaintiffs also argue that certain documents were improperly withheld under

Exemption 1 because they contain ambiguous markings.  *See* Dkt. 80 at 22.  According to the

*Canning* Plaintiffs, this poses two problems.  First, it casts doubt on the Department's claim that

the redacted material is, in fact, classified.  Second, it raises the possibility that the records

continue to reside in the Department's general files without classification markings and that, as a

result, the records are classified only as to Plaintiffs.  *Id.* at 23.  As a review of the relevant

records reveals, however, neither argument is persuasive.

 The *Canning* Plaintiffs identify five documents that they contend have "ambiguous

markings":  C05475518, C05475530, C05475549, C05475562, C05575691, and C05619429.

Dkt. 80-1 at 3–4 (Fourth Canning Decl. ¶ 5).  Each of those documents, however, bears a

heading indicating that it is classified at either the "CONFIDENTIAL" or "SECRET" level.  *Id.*

at 3 (Fourth Canning Decl. ¶ 5) (explaining that "each bear a notation indicating they had been

classified by the Deputy Assistant Secretary of State, Global Information Service"); *id.* at 13–46

(Exs. B–K).  The *Vaughn* index, moreover, explains that "the Department classified portions of the document that were originally UNCLASSIFIED."  *See, e.g*., Dkt. 81-2 at 5 (C05475518); *see also id*. at 8 (C05475530), 13 (C05475549), 14 (C05475562), 32 (C05595691),[2] 33 (C05619429).  In short, there is no meaningful ambiguity.

Plaintiffs' disagreement is based on surviving "UNCLASSIFIED" or "SBU" portion marking, but those markings must be understood in light of the "CLASSIFIED" headers and the *Vaughn* index.  Although the Department might reasonably have crossed out the surviving markings and added new portion markings, there is no question that the redacted portions have, in fact, been designated as classified.  Similarly, there is no question that, if a State Department employee were to review any of these documents, that employee would understand that the document is classified.  Finally, there is no basis to infer that the Department maintains these classified records in general files that are accessible by employees or others without the requisite security clearance, and there is no reason to conclude that, even if they did, the documents would have lost their status as classified records under Executive Order 13526.

c.    Post-Request Authority to Classify

Finally, the *Canning* Plaintiffs argue that the Department has failed to carry its burden of showing that it complied with the "personal-participation or under-the-direction-of" requirement of Section 1.7(d), both with respect to its original ten Section 1.7(d) withholdings and fifty of its

_____

[2]  The Fourth Canning declaration identifies this document as "C05575691," Dkt. 80-1 at 3–4 (Fourth Canning Decl. ¶ 5), but the document Plaintiffs attach to the declaration—and which number corresponds to the correct *Vaughn* entry—is Document "C05595691," *see id.* at 26–30; Dkt. 81-2 at 33–34.  It is unclear whether the attached document is the document that the *Canning* Plaintiffs intend to rely upon, and the heading is cut-off in the version filed with the Court.  The *Vaughn* index, moreover, uses a slightly different locution in discussing this document, noting simply that the record was classified in part after the Department received the *Canning* Plaintiffs' FOIA request.  If Plaintiffs, in fact, have a different document in mind, they may renew their motion with respect to that document as appropriate.

subsequent Section 1.7(d) withholdings.  As explained below, the Court concludes that the Department has satisfied its burden with respect to all but four of the withheld records.

Under the Executive Order, an agency may classify documents *after* receiving a FOIA request only "with the personal participation or under the direction of the agency head, the deputy agency head, or the senior agency official designated under [S]ection 5.4 of th[e] [Executive] [O]rder."  EO 13526 § 1.7(d).  The senior State Department official designated under Section 5.4 is the Under Secretary of State for Management.  *See* 22 C.F.R. § 9.3.  For present purposes, all agree that neither the Secretary or Deputy Secretary of State nor the Under Secretary for Management personally participated in the Section 1.7(d) review, and all agree that the review did not take place "under the direction of" the Secretary or Deputy Secretary of State. The question, accordingly, comes down to whether the post-request review occurred "under the direction of" the Under Secretary.

Two Department of State "notices" issued by the Under Secretary for Management speak to this issue.  The first, which was in effect at the time Deputy Assistant Secretary Grafeld conducted her review, "authorize[d] and direct[ed] the Deputy Assistant Secretary for Records and Publishing Services . . . to be the official to classify information on a document-by-document basis consistent with the circumstances and procedures described in" the relevant Executive Order, and provided that "[t]he Deputy Assistant Secretary shall act under the direction of the Under Secretary for Management and shall keep [him] apprised of actions taken under this authority."  64 Fed. Reg. 7227 (Feb. 12, 1999).  The second, which was in effect at the time IPS Director Stein conducted his review, "authorize[s] and direct[s] the Deputy Assistant Secretary . . . and the Director of Information Programs and Services . . . to classify or reclassify information consistent with the circumstances and procedures described in [S]ection 1.7(d) of

E.O. 13526," and provides that "this authority shall be exercised on a document-by-document basis only as to information that has not been previously released to the public under proper authority, and only if such classification meets the requirements of E.O. 13526." 81 Fed. Reg. 15605 (Mar. 23, 2016). The second notice omits the requirement that the Under Secretary be kept "apprised of actions taken," 64 Fed. Reg. at 7227, but does specify that "[t]he official exercising [the Section 1.7(d)] authority shall do so under the direction of the Under Secretary for Management," 81 Fed. Reg. at 15605.

When the Court last considered whether Grafeld's document-by-document review satisfied the under-the-direction-of standard, it concluded that the 1999 notice was facially consistent with the requirements of Section 1.7(d); the notice required that the official engaged in the document-by-document review exercise the assigned authority "under the direction of . . . the Under Secretary" and that she keep the Under Secretary "apprised of actions taken under" the assigned "authority." *Canning I*, 134 F. Supp. 3d at 507 (quoting 64 Fed. Reg. at 7227). The Court now reaffirms that conclusion and further concludes that the 2016 notice is also facially consistent with the Executive Order; although it omits the express duty to keep the Under Secretary apprised of the classification actions taken, it maintains the core requirement that the official engaged in the document-by-document review act "under the direction of the Under Secretary for Management," which is precisely what the Executive Order requires. 81 Fed. Reg. at 15605.

That, however, answers only part of the question. As the Court also explained in *Canning I*, more than *facial* consistency is required; it is not enough, in short, simply to say that the reviewing official "shall" exercise her authority "under the direction of the Under Secretary." *See* 134 F. Supp. 3d at 507–08. The process must also be structured or implemented in a way

that provides an "opportunity for actual oversight by the Under Secretary" because, absent such an opportunity, the under-the-direction-of requirement would be rendered obsolete: "[T]here would be no meaningful difference between acting at the Under Secretary's direction and acting pursuant to [an unconstrained] delegation of his authority." *Id*. at 508. Given that "§ 1.7(d) limits post-request classification authority in order . . . to ensure that a senior government official takes responsibility for intervening classification decisions that thwart otherwise valid FOIA requests," such a wholesale delegation of responsibility would contravene the purposes of the Executive Order's limits. *Id*. at 506. To be clear, this does not mean that the Under Secretary must review and approve each decision. Rather, one acts under the "direction" of another if she is subject to that person's "guidance[,] supervision," *Merriam Webster's Collegiate Dictionary* 328 (10th ed. 1996), or "management," *The New Oxford American Dictionary* 479 (2d ed. 2005).[3] It is not the Court's role to micromanage how the Under Secretary—or any other senior official designated under the Executive Order—guides, supervises, or manages the review process. But, because the Executive Order requires that the document-by-document review occur "with the personal participation of, or under the direction of, the agency head, the deputy agency head," or designated official (here, the Under Secretary), EO 13526 § 1.7(d), the Court

---

[3] It is not uncommon for a statute or rule to require that a government official "direct" the activities of other officials, although each context is unique. All "litigation in which the United States . . . is a party," for example, is conducted "under the direction of the Attorney General." 28 U.S.C. § 516; *see also id.* § 519 (supervision of litigation). To perform this function, the Attorney General issues guidance and sets policy relating to that litigation, *see* Justice Manual, https://www.justice.gov/jm/justice-manual (last visited Oct. 23, 2018), and he relies on delegations to other department officials, *see, e.g*., 28 C.F.R. § 0.45 (functions of Assistant Attorney General for the Civil Division). Here, as the Court has previously explained, *Canning I*, 134 F. Supp. 3d at 506, however, the structure and language of the Executive Order preclude a wholesale delegation of authority, and, unlike the Attorney General, the Under Secretary has not issued any guidance to the reviewing officials (beyond the guidance that appears in the Executive Order itself) regarding the exercise of their responsibilities.

must ensure that responsibility for the review is not simply reassigned in its entirety to the Deputy Assistant Secretary or the IPS Director. In short, the Under Secretary is free to decide *how* he will guide, supervise, or manage the review process, but the Court must decide *whether* he has done so.

The Court starts with the slice of *Canning I* that remains for decision. In that opinion, the Court observed that, in the then-controlling notice, the Under Secretary "direct[ed]" that Grafeld conduct the required document-by-document review "under [the Under Secretary's] direction" and that she "keep [him] apprised of actions taken under this authority." 134 F. Supp. 3d at 507 (quoting 64 Fed. Reg. at 7227). Although that process was, in the abstract, sufficient, the Court could not enter summary judgment in favor of the Department because the record did not reveal whether the contemplated process was, in fact, followed. *Id.* at 507–08. The Court, accordingly, provided the Department with sixty days to "submit additional declarations confirming that Grafel previously reviewed—or has now reviewed—each document classified in accordance with § 1.7(d) and that she previously apprised—or has now apprised—the Under Secretary of her decisions." *Id.* at 508.

Consistent with the Court's order, the Department has now submitted a declaration from Grafeld attesting that she personally reviewed each of the documents at issue and determined that each document satisfied the requirements for classification under the Executive Order, Dkt. 48-1 at 2–3 (Grafeld Decl. ¶ 3), and that she has "apprised Under Secretary for Management Patrick Kennedy of [her] decision to classify the [specific] documents [at issue] in accordance with § 1.7(d) of Executive Order 13526," *id*. at 3 (Grafeld Decl. ¶ 4). That declaration addresses the Court's remaining question, and it establishes that the review of these particular documents was, as contemplated by the February 1999 notice, conducted under the direction of the Under

Secretary. Although not the only means by which a senior official might guide, supervise, or manage another official, by "appris[ing]" the Under Secretary of her decisions, Grafeld provided the Under Secretary with "some opportunity for actual oversight," *Canning I*, 134 F. Supp. 3d at 508. That opportunity, when combined with the "direct[ion]" to conduct a review "on a document-by-document basis consistent with the" requirements specified in the Executive Order, is sufficient to show that the review was conducted "under the direction of" the Under Secretary. 81 Fed. Reg. at 15605.

The *Canning* Plaintiffs disagree, arguing that the Grafeld declaration is inadequate because it does not explain how Grafeld apprised the Under Secretary of her determinations, does not identify what information she provided him, and does not indicate whether the Under Secretary concurred in her determinations. Dkt. 49 at 2. Nothing in the Executive Order or in the concept of "direction," however, requires either that level of detail or the affirmative concurrence of the Under Secretary. Here, moreover, Grafeld *has* identified the substance of her apprisal: in her declaration, she pinpoints the specific documents at issue and reports that she apprised the Under Secretary of her decision to classify those specific documents in accordance with § 1.7(d) of Executive Order 13526. Dkt. 48-1 at 3 (Grafeld Decl. ¶ 4). The Under Secretary directed that Grafeld conduct the review, told her to do so in compliance with the Executive Order, and had "some opportunity for actual oversight," *Canning I*, 134 F. Supp. 3d at 508, because he was "apprised of actions taken under" his direction. Dkt. 48-1 at 3 (Grafeld Decl. ¶ 4). This process may lie at the edge of any reasonable understanding of what constitutes guidance, supervision, or management. But, as the Supreme Court has cautioned in a different context, absent clear constraints or compelling circumstances, agencies should be left free to fashion their own rules and procedures in the discharge of their responsibilities. *Vt. Yankee*

*Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543 (1978).  Because nothing in the Executive

Order precludes the approach the Department applied, and because that approach ensures that the

Under Secretary bears ultimate responsibility for the classification decisions, the Court concludes

that the Department has carried its burden with respect to the records at issue in *Canning I*.

That same conclusion also applies to the additional records that Grafeld reviewed and

classified or reclassified after the *Canning* Plaintiffs submitted their FOIA request.  As Stein now

attests, those records were reviewed pursuant to the same notice from the Under Secretary;

Grafeld reviewed each document; and she apprised the Under Secretary of her determinations "in

a biannual report."  Dkt. 81-1 at 5 (Second Stein Decl. ¶ 7).  Again, the Under Secretary

acknowledged that Grafeld was acting "under his direction," and he had the opportunity to

disagree with her actions when he was "apprised" of her decisions.  That is enough.

The Court is not convinced, however, that the Department has carried its burden with

respect to the four records that Stein reviewed pursuant to the March 23, 2016 notice.  *Id*. at 4–5

(Second Stein Decl. ¶¶ 6, 8).  As noted above, the Department has narrowly carried its burden

with respect to the records that Grafeld reviewed.  What pushed the Department's showing over

the line was the evidence that Grafeld "personally reviewed" each of the documents; that the

Under Secretary was apprised of Grafeld's decision to classify those specific documents "in

accordance with § 1.7(d) of Executive Order 13526," Dkt. 48-1 at 3 (Grafeld Decl. ¶ 4); and that

the Under Secretary had the opportunity to disagree or otherwise guide the process.  With respect

to the remaining four records, however, Stein merely asserts that he "*will* apprise the Under

Secretary for Management of [his] actions in the next biannual report."  *Id.* (Second Stein Decl. ¶

8) (emphasis added).  There is no evidence that the Under Secretary was aware that the four

records were subject to reclassification; there is no evidence that he had the opportunity to

express a contrary view; and there is no evidence he guided, managed, or supervised Stein's review in any way, beyond merely assigning the review responsibility to him.

In focusing on whether the Under Secretary was apprised of Stein's determinations, the Court does not mean to suggest that appraisal and an opportunity to weigh in is the only way to satisfy the under-the-direction-of requirement. As noted above, judges need to avoid injecting themselves "into day-to-day agency management." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66–67 (2004). The problem, however, is that "direction" requires *something* more than an unconstrained delegation, and the only something that the Department has identified is the appraisal process. Without that—or *something* else—all the Department has is a notice that says, "perform the review required by the Executive Order under my direction," with no guidance, supervision, or management. Such a bare reassignment of authority cannot be squared with the manifest intent of the Executive Order to require "participation" or "direction" by the agency head, deputy agency head, or designated "senior agency official." EO 13526, § 1.7(d). Absent some indicia of "participation" or "direction" by one of these senior Department officials, EO 13526 § 1.7(d), the Court cannot conclude that a post-request classification determination was "properly" made "pursuant to [the] Executive [O]rder," 5 U.S.C. § 552(b)(1)—and here, with respect to these four documents, there is no evidence that appraisal or any other means of "direction" has occurred. The Court, accordingly, concludes that the Department—at least on the present record—is not entitled to summary judgment with respect to the four records that Stein classified.

Finally, the Court is unpersuaded by the *Canning* Plaintiffs' more sweeping contention that the records at issue were not properly classified in accordance with the State Department's Foreign Affairs Manual—or "FAM." They argue that the FAM in place at the relevant time

required that the Under Secretary *and* the Deputy Assistant Secretary for Global Information and Services draft a memorandum regarding "upgrad[ing]" the classification of the relevant documents and that the memorandum be "approved." Dkt. 80 at 18–19. And because there is no evidence that the Under Secretary played any role in the process or that the classification decisions were "approved," they contend, the Department has failed to carry its burden of showing that the records were properly classified. *Id.* at 19–20. But, as explained in the Second Stein declaration, the version of the FAM quoted in Plaintiffs' brief contained an error that was corrected in subsequent versions; the requirement was not that the Under Secretary and Deputy Assistant Secretary draft the memorandum but, rather, that "the classification memorandum is drafted for the Under Secretary . . . , the Deputy Assistant Secretary . . . , or the director of the Office of Information Programs and Services . . . , who subsequently review and approve or disapprove the memorandum." Dkt. 81-1 at 6 n.5 (Second Stein Decl. ¶ 9 n.5). Moreover, even putting that aside, FOIA Exemption 1 applies to records that "are in fact properly classified pursuant to [the] Executive [O]rder," 5 U.S.C. § 552(b)(1), and does not require compliance with the FAM.

\* \* \*

The Court concludes that the Department has satisfied the requirements of Executive Order 13562 regarding the post-request classification of responsive records for all but four of the withheld records. As to those four, the Department has not yet shown that it complied with Executive Order 13562, and thus has not shown that those documents were properly withheld. The Court will, accordingly, grant in part and deny in part the Department's motion for summary judgment with respect to Exemption 1.

2.      *Exemption 5*

Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  This exemption shields "those documents . . . normally privileged in the civil discovery context."  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  Courts have, accordingly, incorporated the three traditional civil discovery privileges under Exemption 5: "(1) the attorney work-product privilege; (2) the deliberative process privilege; and (3) the attorney-client privilege."  *Wright*, 121 F. Supp. 3d at 184.  Both SAE and the *Canning* Plaintiffs challenge the Department's invocation of Exemption 5 to protect purportedly deliberative records.

The deliberative process privilege protects "documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"  *Sears, Roebuck & Co.*, 421 U.S. at 150 (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966)).  The "privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance 'the quality of agency decisions,' . . . by protecting open and frank discussion among those who make them within the Government."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (citations omitted).  "Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions."  *Sears, Roebuck & Co.*, 421 U.S. at 151.

"To qualify for withholding under Exemption 5's executive privilege, information must be both 'predecisional' and 'deliberative.'"  *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992); *see also Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C.

Cir. 2014); *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 874 (D.C. Cir. 2010); *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006). A record "is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made," and it is "deliberative if it 'reflects the give-and-take of the consultative process.'" *Petroleum Info. Corp.*, 976 F.2d at 1434 (citations omitted). The agency asserting the privilege bears the burden of establishing that the information is exempt. *Fed. Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352 (1979); *Mink*, 410 U.S. at 93; *Pub. Citizen, Inc.*, 598 F.3d at 869; *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014). "Summary judgment is warranted when the agency's affidavits 'describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Elec. Frontier Found.*, 739 F.3d at 7 (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)); *see also Senate of the Commonwealth of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987). To meet this burden, an "agency must establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process.'" *Senate of the Commonwealth of P.R.*, 823 F.2d at 585–86 (citation omitted).

a.    *Canning* Plaintiffs' Exemption 5 Challenge

The *Canning* Plaintiffs challenge the Department's application of Exemption 5 to three documents, all of which are "drafts" of a letter from President Obama to King Abdullah of Saudi Arabia. Dkt. 80 at 25 (citing Documents C05781947, C06231742, C06320987). The Department explains in its *Vaughn* index that Document C05781947 is "a draft letter to King Abdullah of Saudi Arabia," which was withheld pursuant to Exemption 5 because it is "pre-decisional and deliberative with respect to a final determination on the content of the letter," and

its release "could reasonably be expected to chill the open and frank expression of ideas, recommendations, and opinions that occur when U.S. Government officials are crafting text for signature by the President." Dkt. 72-2 at 146–49. Documents C06231742 and C06320987 are Arabic "versions" of document C05781947: "Document C06231742 is an incomplete draft of the letter and Document C06320987 is an unsigned draft of the full letter." *Id.* at 144. According to the Department, the withheld material "is pre-decisional and deliberative with respect to the final determination on the content of the letter," and its release "would impede the ability of responsible executive branch officials to formulate" policy "by inhibiting candid discussion and the expression of recommendations and judgments regarding future courses of action." *Id.*

As an initial matter, the *Canning* Plaintiffs assert that the draft letters "do not themselves contain the deliberators' proposals or arguments about what is to be said to the King, but are rather 'snapshots' of the then-current undecided letter-text which was under discussion." Dkt. 80 at 26. Although it is unclear whether they intend to press this as a stand-alone argument, to the extent they do, the Court is unpersuaded. The deliberative process privilege is designed to protect the "open and frank discussion" of proposals within the government, *Klamath Water Users Protective Ass'n*, 532 U.S. at 8–9, regardless of how a proposal or suggestion is offered. When a government employee or official prepares a draft letter—or speech, brief, or guidance document—for an intermediate or ultimate decisionmaker's consideration, she is offering a proposal for consideration, just as she would do in drafting an options memo or in participating in a group discussion. *See Sierra Club v. U.S. Dep't of Interior*, 384 F. Supp. 2d 1, 19–20 (D.D.C. 2004). The Court, accordingly, concludes that a draft letter can, as appropriate, fall within the deliberative process privilege.

The *Canning* Plaintiffs' principal argument posits that the three documents at issue were not, in fact, drafts. With respect to one of the three records—Document C06320987—they argue that the Department has, in effect, conceded that the Document "is the final version" of the letter from President Obama to King Abdullah, and they, accordingly, seek summary judgment in their favor. Dkt. 79 at 1–4. And, with respect to the other two—Documents C05781947 and C06231742—they assert that enough uncertainty exists that the Court should deny the Department's motion for summary judgment. Dkt. 80 at 26–33.

The *Canning* Plaintiffs build their claim that Document C06320987 "is clearly the final version of the letter" on the fact that the Department's *Vaughn* index refers to Document C06231742 as "an incomplete draft of the letter," while it refers to Document C06320987 as "an unsigned draft of the full letter." Dkt. 80 at 26–27; Dkt. 72-2 at 144. In their view, "[n]otwithstanding the word 'draft,' that description conveys that the form, substance, and translation in Document C06320987 are complete" and that "the Arabic-language letter awaits only copying onto Presidential letterhead and the President's signature." Dkt. 80 at 27. To this, Plaintiffs add that the *Vaughn* index entry for these Arabic-language versions of the letter lacks the "draft" designation found in the column header that appears for the English-language version of the letter, and, unlike the entry for the English-language version, the *Vaughn* index refers to the documents—at least once—as "versions of a letter" as opposed to "draft[s]" of a "letter." *Compare* Dkt. 72-2 at 144 *with id.* at 146. In response, Stein attests that the three versions of the letter "are all in draft form, as stated in the 'Description' category of the *Vaughn* Index." Dkt. 81-1 at 6–7 (Second Stein Decl. ¶ 11). Stein further explains that the differences that the *Canning* Plaintiffs highlight in the *Vaugh* index are "merely stylistic" and were "not intended to convey that the Arabic versions are final." *Id.* at 7 (Second Stein Decl. ¶ 11).

To start, the Court is unconvinced that Document C06320987 "is clearly the final version of the letter." Dkt. 80 at 26. Both the *Vaughn* index and the Second Stein Declaration represent that the document is a draft, Dkt. 81-1 at 6–7 (Second Stein Decl. ¶ 11), and that characterization, at the very least, gives rise to a disputed issue of material fact. But, at the same time, the Court is unconvinced—at least on the present record—that the three documents were deliberative. To be sure, none of the documents bear the President's signature, and none is printed in final form on presidential stationary. If all that remained to be done, however, was to print and sign the letter—and if, in fact, any of the three documents is identical in *substance* to the letter that was sent to King Abdullah—it is difficult to discern how that document reflects anything that is "*pre*-decisional." That concern, moreover, is more than hypothetical. Given the opportunity to respond to the *Canning* Plaintiffs' arguments—including their contention that "all decisions [had] been made" regarding the content of the letter—the Second Stein Declaration merely attests that the documents were "in draft *form*." Dkt. 81-1 at 6–7 (Second Stein Decl. ¶ 11) (emphasis added). The declarant's use of the word "form" at least raises the question whether he means to distinguish between the "form" and the "substance" of the records.

It may be that the documents were drafts, both as a matter of "form" and "substance." It may be that the President had yet to sign off on the documents, and that the Department contends that a recommendation that is ultimately approved remains a recommendation until finally and formally approved. Or it may be that the Department takes the view that a pre-decisional, presidential recommendation does not lose its exempt status, even after the President formally adopts the recommendation without modification. On the present record, however, the Court cannot discern what significance the Department attaches to the word "draft," and, to the extent it intends to distinguish between "drafts in form" and "drafts in substance," the Department has

not briefed any of the potentially relevant legal issues. Moreover, because the Department has failed to release a final, signed version of the letter, *see* Dkt. 80 at 32 n.14, an unsigned—but otherwise final—version of the letter would add materially to FOIA's goal of shedding light on workings of government. *See Robbins Tire & Rubber Co.*, 437 U.S. at 242. The Court will, accordingly, deny summary judgment with respect to the applicability of Exemption 5 to the Documents C06320987, C05781947, C06231742.

       b.     <u>SAE's Exemption 5 Challenge</u>

Finally, SAE challenges the Department's use of the Exemption 5 deliberative process privilege to withhold thirty-eight records in whole or in part. Dkt. 77 at 11. Like the *Canning* Plaintiffs, SAE focuses on the Department's decision to withhold "drafts," but, unlike the *Canning* Plaintiffs, SAE offers little reason to question the Department's characterization of the records at issue. Instead, SAE simply asserts in categorical terms that the descriptions contained in the Department's *Vaughn* index fail to provide "sufficient context with which to evaluate" the Department's reliance on the deliberative-process privilege, and it offers six examples to support its contention. Dkt. 77 at 12 (citing Documents C05429202, C05475534, C05475572, C05475573, C05517719, C05999326).

The deliberative process privilege "covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). As noted above, an agency invoking the privilege bears the burden of showing that "the document is both 'predecisional' and 'deliberative.'" *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1194 (D.C. Cir. 1991). The agency must also offer "specific and detailed proof that disclosure would defeat, rather than further, the purposes of . . . FOIA." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 258 (D.C. Cir. 1977). Review

of the six examples that SAE cites shows that the Department has carried this burden with respect to the deliberative process withholdings that SAE challenge (other than the three withholdings, discussed above, that the *Canning* Plaintiffs have also challenged).

The first example—Document C05429202—is a draft of a paper regarding "how certain terms [would] be defined for the purposes of" PSD-11. Dkt. 81-2 at 4. The document is classified and was withheld on that ground. *Id*. In addition, it was withheld pursuant to Exemption 5 because it is "pre-decisional and deliberative with respect to a final determination on the content of the briefing paper," and because its release "could reasonably be expected to chill the open and frank exchange of ideas and recommendations that occur when Department officials are crafting a paper for a high-ranking Department official and developing strategic policy guidance on a sensitive subject." *Id*. The Department further represents that "[d]isclosure of this information would impede the ability of responsible executive branch officials to formulate and carry out programs by inhibiting candid discussion and the expression of recommendations and judgments regarding future courses of action." *Id*. The Court concurs in the assessment that a draft document proposing how to define terms used in a presidential national security directive lies at the core of the deliberative process privilege.

The next three examples—Documents C054755732, C05475534 and C05475572—are, according to the *Vaughn* index, "drafts of a memo from the Special Coordinator for Middle East Transitions . . . and Assistant Secretary for [Near Eastern Affairs]. . . outlining plans for U.S. Support to [Middle East and North Africa] Transition Countries." Dkt. 72-2 at 10. The Department asserts that the documents are "pre-decisional and deliberative with respect to a final determination on the content of the memos and whether and how to provide support to the transition governments of Egypt, Libya, Tunisia, and Yemen." *Id*. at 10–11. The Court is, once

again, persuaded that draft memoranda, which address "whether and how to provide support" to foreign governments, lie at the core of the privilege.

The Court is also unconvinced by SAE's contention that the Department must disclose the extent to which the "'draft' findings and conclusions outlined in those documents [were] ultimately relied upon in the discharge of official duties." Dkt. 77 at 12. Although a document that is "predecisional at the time it is prepared . . . can lose that status if it is adopted, formally or informally, as the agency position on an issue," *Coastal States Gas Corp*., 671 F.2d at 866, that does not mean that every suggestion, proposal, or draft that precedes a final decision—and that is consistent with that decision—loses its protected status. To be sure, the privilege does not extend to "'opinions and interpretations which embody [an] agency's effective . . . policy.'" *Elec. Frontier Found.*, 739 F.3d at 7 (quoting *Sears, Roebuck & Co*., 421 U.S. at 153). It does, however, protect "'all papers which reflect the agency's group thinking in the *process* of working out its policy,'" *id*. (emphasis added)—even if portions of that "thinking" are ultimately persuasive to those charged with making final, operative decisions. The relevant question is whether the record at issue reflects the ideas, theories, or suggestions that "'go into the making of'" policy—in which case the privilege is available—or, rather, reflects the policy "'itself'"—in which case the privilege does not apply. *Id*. at 8 (quoting *Coastal States Gas Corp.*, 671 F.2d at 868). Here, there is no basis to conclude that any of the three "draft" memoranda ever "themselves" embodied a final statement of Department policy.

The fourth example—Document C05517719—is a "draft Action Memo for the Secretary [of State] regarding a proposed call to Egyptian President Morsy," which includes "draft text, including red-line edits, regarding a recommendation . . . to the Secretary on topics to be discussed during the call and background information." Dkt. 72-2 at 35. This document, which

includes red-line edits and consists of a recommendation from a subordinate to a superior about a policy decision, falls squarely within the deliberative process privilege. *See Coastal States*, 617 F.2d at 868 ("[A] document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made."); *Brinton v. Dep't of State*, 636 F.2d 600, 605 (D.C. Cir. 1980) ("[F]inal opinions . . . typically flow from a superior with policy-making authority to a subordinate who carries out the policy.").

SAE's final example—Document C05999326—is "a briefing paper prepared for the Secretary's briefing of members of the House and Senate" and "consists of a series of proposed answers to anticipated questions regarding various U.S. foreign policy issues." Dkt. 72-2 at 142–43. The Department asserts that the information is "pre-decisional and deliberative with respect to a final decision on the content of . . . the information to be communicated to Congress" as well as "pre-decisional and deliberative with respect to a final determination on the particular U.S. policy under consideration." *Id.* at 143. This description is, once again, sufficient to sustain the privilege. Despite SAE's assertions to the contrary, the *Vaughn* index describes the context and nature of the document in detail; it is a "draft" memorandum containing "recommendations" for the Secretary of State regarding a conversation with a foreign head of state. As such, the document lies at the core of the deliberative process privilege. *See Elec. Frontier Found.*, 739 F.3d at 7 (agency must "'describe [its] justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption,'" and that showing cannot be "'controverted by either contrary evidence in the record nor by evidence of agency bad faith'" (quoting *Miller*, 730 F.2d at 776).

*   *   *

Having reviewed the *Vaughn* index and the parties' pleadings, the Court concludes that the Department has carried its burden of showing that it properly invoked Exemption 5 with respect to all of the withheld material, with the exception of the three "draft" letters to King Abdullah. The Court will, accordingly, grant in part and deny in part the Department's motion for summary judgment with respect to Exemption 5.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** in part and **DENIES** in part the Department's motion for summary judgment, Dkt. 74, and **DENIES** the *Canning* Plaintiffs' cross-motion for summary judgment, Dkt. 79. The sole remaining issues in this proceeding are (1) whether the four records that Stein classified after the *Canning* Plaintiffs submitted their FOIA request were—or have now been—classified "under the direction" of the Under Secretary, and (2) whether the three "draft" letters to King Abdullah fall within the deliberative process privilege. The Department may renew its motion for summary judgment as consistent with this opinion.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: October 24, 2018