# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GEORGE CANNING, *et al*., <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE, <br><br> *Defendant*. | Civil Action No. 13-831 (RDM) |

## <u>MEMORANDUM OPINION</u>

This is the third—and final—round of dispositive motions in this case brought under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b), seeking to compel the Department of State to release certain records relating to a 2010 memorandum from President Obama to his foreign policy advisors, entitled Presidential Study Directive 11, and records concerning the Muslim Brotherhood. The Court has previously resolved most of the questions posed by the case. *See Canning v. U.S. Dep't of State*, 134 F. Supp. 3d 490 (D.D.C. 2015) ("*Canning I*"); *Canning v. U.S. Dep't of State*, 346 F. Supp. 3d 1 (D.D.C. 2018) ("*Canning II*"). Two issues, however, remain. *First*, the Court held in *Canning II* that the State Department had yet to satisfy the dictates of FOIA Exemption 1 with respect to four records because (1) those records were classified *after* Plaintiffs submitted their FOIA request, and (2) the Department had not shown that the records were classified "on a document-by-document basis with the personal participation or under the direction of" the designated senior agency official, as required under Executive Order 13526. 346 F. Supp. 3d at 16, 23–24. The State Department has now filed a supplemental declaration that, in its view, fills the evidentiary lacuna. *Second*, the Court's

*Canning II* decision raised the question whether three documents that the Department withheld as "deliberative" under FOIA Exemption 5—drafts of a letter from President Obama to King Abdullah of Saudi Arabia—were, in fact, drafts proposed for the President's consideration, as opposed to unsigned copies of the final letter. *Id.* at 26–27. The Department submits that it has now put the question to rest (to the extent feasible) as well.

As explained below, the Court agrees that the Department has now carried its burden with respect to the two issues left unresolved in *Canning II*. The Court will, accordingly, grant the Department's cross-motion for summary judgment on the remaining issues, Dkt. 88, and will deny Plaintiffs' motions for partial summary judgment with respect to those same issues, Dkt. 86, Dkt. 90.

## ANALYSIS

Because the Court has issued two prior opinions that explain the background of this action and address the bulk of the parties' contentions, *Canning I*, 134 F. Supp. 3d at 497–99, *Canning II*, 346 F. Supp. 3d at 10–12, and because all that remains of their dispute are two, narrow issues, the Court will assume familiarity with the relevant background and will proceed directly to the two unresolved issues.

The Court will address each exemption in turn.

## A.      Exemption 1

The first remaining issue turns on whether the Department properly classified four responsive documents after Plaintiffs submitted their FOIA request. As the Court has previously explained, *see Canning II*, 346 F. Supp. 3d at 16, FOIA Exemption 1 permits an agency to withhold "matters that are . . . specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and [that] are in fact

properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Executive Order 13526, in turn, provides that, if responsive records are "'classified after the . . . FOIA request was submitted,' the Department must show that '[it] satisfied the requirements of [Executive Order 13526] § 1.7(d).'" *Canning I*, 134 F. Supp. 3d at 506 (quoting *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 167 (D.D.C. 2013)). That section authorizes post-request classification "only if such classification meets the requirements of [the Executive] [O]rder and is accomplished on a document-by-document basis with the personal participation or under the direction of the agency head, the deputy agency head, or the senior agency official designated under section 5.4 of this [O]rder." Executive Order 13526 § 1.7(d). The State Department's designated senior official is the Under Secretary of State for Management. 22 C.F.R. § 9.3. Finally, as the Court has previously held, the "the [document-by-document classification] process must . . . be structured or implemented in a way that provides an 'opportunity for actual oversight by the Under Secretary.'" *Canning II*, 346 F. Supp. 3d at 20 (quoting *Canning I*, 134 F. Supp. 3d at 507–08).

With respect to most of the documents withheld pursuant to an after-the-fact classification, the Court held in *Canning II* that the Department had "narrowly carried its burden" because (1) a State Department employee "'personally reviewed' each of the documents," and (2) "the Under Secretary was apprised of [that employee's] decision to classify those specific documents" and "had the opportunity to disagree or otherwise guide the process." *Id.* at 22 (quoting Dkt. 48-1 at 3 (Grafeld Decl. ¶ 4)). With respect to the four documents now at issue, however, the Court held that the Department had failed to carry its burden because the employee who reviewed those documents attested only that he "*will* apprise the Under Secretary for Management" of his classification decisions. *Id.* at 22 (quoting Dkt. 81-1 at 5 (2d Stein Decl.

3

¶ 8)).  There was, in other words, "no evidence that the Under Secretary was aware that the four records were subject to reclassification; there [was] no evidence that he had the opportunity to express a contrary view; and there [was] no evidence he guided, managed, or supervised [the other official's] review in any way, beyond merely assigning the review responsibility to him."  *Id.* at 22–23.

The Department has now submitted a declaration attesting that, during the relevant timeframe, "the Department had no Under Secretary for Management" and that the "Deputy Under Secretary for Management exercised all of the authorities of" that office "pursuant to a delegation of authority."  Dkt. 88-2 at 3 (3d Stein Decl. ¶ 6) (quoting 84 Fed. Reg. 3529 (Feb. 12, 2019)).  According to that declaration, the reviewing official "apprised the Deputy Under Secretary for Management of [his] classification actions and [the Deputy Under Secretary] concurred with those actions."  *Id.*  "In plaintiffs' view, [this] cur[es] the problem regarding these four documents as set out in [*Canning II*]."  Dkt. 91 at 2.  As this issue is no longer in dispute—and thus the Court has no occasion to pass on the adequacy of the delegation of this authority to the Deputy Under Secretary under the circumstances—the Court will grant summary judgment in favor of the State Department with respect to the Exemption 1 withholdings.

**B.    Exemption 5**

The second unresolved issue relates to whether the Department has carried its burden of showing that three "drafts" of a letter from President Obama to King Abdulla of Saudi Arabia were deliberative and thus subject to FOIA Exemption 5.  As the Court has previously explained, *Canning II*, 346 F. Supp. 3d at 24, the deliberative process privilege protects "documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"  *NRLB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318,

324 (D.D.C. 1966)).  To satisfy the requirements of Exemption 5, the "information must be both

'predecisional' and 'deliberative.'"  *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d

1429, 1434 (D.C. Cir. 1992).

In *Canning II*, the Court held that the Department had failed to carry its burden of

showing that the three "drafts" of the letter were deliberative because the declaration that it

proffered was insufficiently clear: the declaration described the documents as in "draft *form*,"

which "at least raise[d] the question whether [the declarant] mean[t] to distinguish between the

'form' and the 'substance' of the records."  *Canning II*, 346 F. Supp. 3d at 26–27.  As explained,

if the documents were merely "drafts" in "form," but not "substance," they might not have been

predecisional for purposes of Exemption 5, *id.*; for example, if the declarant simply meant that a

draft was not yet on presidential letterhead, that might not suffice to invoke Exemption 5.  *Id.*  In

determining whether a document is predecisional and deliberative, the Court must assess

"whether it was generated before the adoption of" the final policy decision and "whether it

reflects the give-and-take of the consultative process."  *Coastal States Gas Corp. v. Dep't of*

*Energy*, 617 F.2d 856, 866 (D.C. Cir. 1980).  This means, among other things, that a document

"can lose" its predecisional "status if it is adopted, formally or informally, as the agency position

on an issue."  *Id.*

The Department has now filed a supplemental declaration from the same official,

attesting that, when he previously indicated that "these letters were all in draft form, [he] did not

intend to suggest that they were not drafts in substance."  Dkt. 88-2 at 4 (3d Stein Decl. ¶ 8).

Rather, he simply "do[es] not know whether these drafts contain language that was ultimately

finalized in whole or in part."  *Id.*  As the declarant explains, the problem is as follows:

> The Department's search for responsive records within its custody did not find
> any version of these draft letters that could be identified as final.  I do not know

> whether any of these three draft letters are wholly or partly identical to any letter that was actually sent by President Obama to King Abdullah of Saudi Arabia. I only know that these documents are three drafts of a letter that was prepared for President Obama's consideration and contain, in substance, recommendations of what President Obama should say. I do not know the ultimate fate of those recommendations.

*Id.* (3d Stein Decl. ¶ 9).

Plaintiffs contend that this description is, once again, inadequate, principally because the declarant's credibility is undermined by his assertion that the draft documents—two of which are Arabic translations—were relied upon by President Obama, who does not speak Arabic, in his deliberative process. Dkt. 91 at 4–8. They are mistaken for a number of reasons. For one, disclosure of these drafts, which could easily be translated back into English, would undermine the interest in unfettered decisionmaking protected by the deliberative process privilege. The deliberative process privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance 'the quality of agency decisions,' . . . by protecting open and frank discussion among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (internal citation omitted). Requiring disclosure of translations of otherwise privileged documents would undermine the ability of government officials to engage in frank discussions, no less than disclosure of the English-language version of the same documents. *See Brunetti v. FBI*, 357 F. Supp. 2d 97, 110 (D.D.C. 2004) (holding that a draft letter to be sent to Italian authorities and its Italian translation were properly withheld under the deliberative process privilege, without a finding that the translation itself was used in agency deliberations). Because the "ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions,"

*Sears*, 421 U.S. at 151, it make little sense to qualify the privilege in the manner Plaintiffs suggest.

Second, the use of translations is presumably most common when the Executive Branch focuses on matters relating to foreign relations and foreign commerce, areas where the deliberative process privilege applies with special force. *See Fulbright & Jaworski v. Dep't of Treasury*, 545 F. Supp. 615, 620 (D.D.C. 1982) (discussing the particular sensitivity around disclosure where the decision in question implicates foreign relations). Diplomatic communications are often nuanced, moreover, where minor changes between drafts can carry significant import and where those asked to prepare drafts for review by more senior officials may worry that disclosure of drafts not yet signed by the principal could have significant foreign affairs consequences. When dealing with a presidential communication with a foreign head of state, those concerns are at their zenith. *See id. Cf. In re Sealed Case*, 121 F. 3d 729, 743 (D.C. Cir. 1997) (discussing the presidential communications privilege and its "constitutional origins" in "the separation of powers").

This case does, however, present one wrinkle. Because the State Department has been unable to locate the final versions of the letter to King Abdullah (if, in fact, a letter was sent), it can neither confirm nor deny that the President adopted any of the drafts as his final decision. The Supreme Court has recognized, however, "that the existence of the privilege [does not] turn[] on the ability of an agency to identify a specific decision in connection with which [a recommendation] is prepared." *Sears*, 421 U.S. at 151 n.18. It follows that an agency need not, at least in the ordinary course, "compare each draft document to its corresponding final decision." *United States v. Phillip Morris USA, Inc.*, 218 F.R.D. 312, 318 (D.D.C. 2003); *see also Soghoian v. OMB*, 932 F. Supp. 2d 167, 183 (D.D.C. 2013); *Reliant Energy Power Gen.,*

*Inc. v. FERC*, 520 F. Supp.2d 194, 204 (D.D.C. 2007); *Exxon Corp. v. Dep't of Energy*, 585 F. Supp. 690, 698 (D.D.C. 1983). Nor is such a comparison even possible in this case because the State Department does not know whether a final decision was ever made, much less whether that decision mirrors the drafts in every material respect.

One reason that courts do not typically require an agency to demonstrate that a draft differs from the final agency record is that such a showing might "expose what occurred in the deliberative process between the draft's creation and the final document's issuance." *Exxon Corp.*, 585 F. Supp. at 698. Simply asking the State Department to indicate whether the drafts at issue are identical (except for the presidential letterhead and signature) to a letter sent by the President might seem like an innocuous demand. The drafts are not public, so merely revealing that they differ from a version the President ultimately signed, at least arguably, conveys little about the deliberative process. And, if the documents are identical, they are, at least arguably, not predecisional.

The demand is far from innocuous in the context of this case, however, because the Department does not know whether the letter was ever sent and, if it was sent, the Department does not know whether the final version is identical to the drafts. Requiring disclosure based on that lack of knowledge would have the precise chilling effect on the "uninhibited" exchange of views and recommendations that the deliberative process privilege is designed to protect. *Coastal States Gas Co*., 617 F.2d at 866. Moreover, even if the Department was able to confirm that the drafts and the final letter were identical, the fact that the President chose to sign off on a draft that he received from the State Department, without making any last-minute changes, itself reveals something about presidential deliberations. Finally, the notion that a recommendation may "lose" its predecisional status if "adopted" by the final decisionmaker, *id.*, does not fit in the

present context for one simple reason: neither the President nor his "immediate personal staff" is subject to FOIA, *see Kissinger v. Reporters Comm. For Freedom of the Press*, 445 U.S. 136, 156 (1980); *cf. Franklin v. Mass.*, 505 U.S. 788, 796 (1992) (president is not an "agency" for purposes of the APA), and thus, unless the President's decision to adopt the recommendation is reflected in the files of the State Department—and, here, it is not—that decision lies beyond the scope of FOIA.

Because the State Department's files show that the drafts in question were, at the time they were prepared, both deliberative and predecisional and do not disclose any subsequent adoption of those drafts in any final decision, the State Department is entitled to summary judgment with respect to its withholdings under Exemption 5.

## CONCLUSION

For the foregoing reasons, the Court will **DENY** Plaintiffs' motions for summary judgment, Dkt. 86 and Dkt. 90, and will **GRANT** Defendant's motion for summary judgment, Dkt. 88.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  April 8, 2020